982 F.2d 530
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
David MONTELONGO-AYALA, Defendant-Appellant,
 No. 92-2106.
 United States Court of Appeals, Tenth Circuit.
 Dec. 9, 1992.
 
 Before LOGAN, JOHN P. MOORE and BRORBY, Circuit Judges.
 ORDER AND JUDGMENT*
 BRORBY, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The cause is therefore ordered submitted without oral argument.
 
 
 2
 Mr. Montelongo-Ayala was charged with two counts of unlawfully transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(B). Mr. Montelongo-Ayala filed a motion to suppress which was denied following an evidentiary hearing. Mr. Montelongo-Ayala then entered conditional pleas of guilty to both charges and was sentenced to two concurrent terms of 119 days imprisonment on May 18, 1992. Mr. Montelongo-Ayala appeals the district court's denial of his motion to suppress. We affirm.
 
 
 3
 An evidentiary hearing was held on the motion to suppress and the United States called three witnesses. The district court, having heard the evidence, made the following findings:
 
 
 4
 Officer Clinton received information that there was an abandoned van south of I-10, and he was advised through a telephone call.
 
 
 5
 He was also advised that there were eight to nine people walking west from the van on a dirt road. He proceeded to the ... van.
 
 
 6
 That the van, according to Government's Exhibit 2 appears to be in the vicinity of Mesilla Dam Road and the Corralitos Road, the Corralitos Road being the road that leads into the McKenna Ranch.
 
 
 7
 Officer Clinton describes the terrain as being flat, desert type country with some hills. He indicated that the ranch road comes about--comes around to Exit 116, which is about two to three miles south of I-10, and about four to five miles from the permanent checkpoint which is located at Mile-Marker 120 1/2.
 
 
 8
 He noted various sets of tracks around the van, and he noticed that some tracks proceeded west from the van.
 
 
 9
 That at that time he was advised by other agents by radio that they had also had signs of tracks at the vicinity of the Pole Line Road and New Mexico 549.
 
 
 10
 That he proceeded from the van directly to that point and then he observed two sets of tracks heading toward I-10, and he followed the tracks from that point, and he observed that there was one set that appeared to be male and one female.
 
 
 11
 He followed the trail and he went to 116 Exit, which followed the road to the Big Chief Quarry, and he again found signs. He cut signs at the railroad track at the 549 overpass.
 
 
 12
 He then observed a rancher that was flagging him down, and he reported that he had seen several people at the railroad overpass on I-10.
 
 
 13
 Agent Clinton continued cutting signs leading to the overpass when he observed two people walking approximately one-third of a mile from him, and he reports that at that point the railroad tracks are about--at the railroad tracks and he also observed at that point that the railroad track which is in the area also pass within approximately thirty feet from the van which had been abandoned.
 
 
 14
 Upon approaching the defendants, Agent Clinton motioned them over, and they came to the van. He first spoke to them in English and then in Spanish and asked them if they were--where they were born and there was no response, and finally he asked them if they were in the country--if they had documentation.
 
 
 15
 There was no response, and finally he asked them if they were in the country illegally, then they admitted that they were not in the country legally.
 
 
 16
 At that point he took them into custody. Up to this point, that was appropriate procedure on the part of Officer Clinton under the Tenth Circuit authority as well as the Supreme Court.
 
 
 17
 This is appropriate Terry stop. Indeed, I find that under the laws of the Tenth Circuit, that the Government does not even have to satisfy Terry, since this is approximately thirty miles from the border, and under the Supreme Court decisions as well as the Tenth Circuit, the agents need not have any probable cause to determine citizenship status in the proximity of any checkpoint in the proximity of the border.
 
 
 18
 But nonetheless, even under the Terry analysis, this was--this qualified as an investigatory stop to determine the citizenships of these two individuals, which is appropriate and proper and legal.
 
 
 19
 He returned to the railroad--the footprints found in the vicinity of the railroad and he back-tracked and found the larger group of tracks heading south into the desert, and subsequently they apprehended some more people.
 
 
 20
 Mr. Montelongo-Ayala concedes the facts and circumstances articulated by Agent Clinton would be sufficient under United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975), but distinguishes this case arguing it is not applicable because Mr. Montelongo-Ayala was not found among a group of people walking along a desert trail, but rather was found walking along an interstate highway miles from where the van was abandoned and miles from where the group of people were seen.
 
 
 21
 Mr. Montelongo-Ayala focuses only upon the actual stop and disregards the information obtained by the Border Patrol Agent prior thereto. The specific facts relied upon by the Border Patrol Agent include the older model van bearing Colorado tags with no seats except in the front (the agent encountered similar vans used to smuggle illegal aliens on a bi-weekly basis); he followed the footprints leading from the van, some of which were made by women; the Pole Line road was often used by smugglers to circumvent the checkpoint as it has telephone poles which are easily visible and provides a route in the correct direction; the Agent had been involved with this route in fifteen prior alien smuggling cases; and the railroad overpass was known to the Agent to be a meeting place for aliens bypassing the checkpoint.
 
 
 22
 The Border Patrol Agent had specific articulable facts that would warrant a reasonable suspicion to stop Mr. Montelongo-Ayala and ask about his citizenship. See United States v. Leyba, 627 F.2d 1059, 1062-63 (10th Cir.), cert. denied, 449 U.S. 987 (1980), and Brignoni-Ponce, 422 U.S. at 884-85.
 
 
 23
 The judgment of the district court is AFFIRMED. The mandate shall issue forthwith.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3